James F. DONAHUE and Patricia
Donahue, Appellants,

v.

BOWLES, TROY, DONAHUE, JOHN-
SON, INC., Donald E. Bowles,
Sr., et al., Appellees.

No. 05–95–01159–CV.

Court of Appeals of Texas,
Dallas.

May 28, 1997

Weldon L. Moore, III, Creel & Atwood, Ben L. Krage, Kasmir & Krage, LLP, Dallas, for Appellants.

E. Eldridge Goins, Jr., Paul A. Mohtares, Goins, Underkofler, Crawford & Langdon, Dallas, for Appellees.

Before CHAPMAN, WHITTINGTON and MOSELEY, JJ.

## OPINION

CHAPMAN, Justice.

This is an appeal from a summary judgment declaring that a covenant not to compete is enforceable and from take-nothing summary judgments in two breach of contract actions. Appellee Bowles, Troy, Donahue, Johnson, Inc. (Bowles–Troy)' sued appellant James F. Donahue [1] seeking a declaratory judgment that a restrictive covenant in an employment agreement between Bowles–Troy and Donahue is enforceable. Donahue counterclaimed, alleging that Bowles–Troy breached an agreement to purchase his stock in the company. Donahue also filed a third-party action against the other Bowles–Troy shareholders and their wives (collectively "shareholders") for breach of the agree-

---

1. Patricia Donahue, James's wife, is also an appellant. She is a party to this litigation based on her community property interest in her hus- band's shares of Bowles–Troy stock. In this opinion, "Donahue" refers to James Donahue.

ment to purchase the stock.[2] All parties filed motions for summary judgment. The trial court declared the restrictive covenant to be enforceable and ordered Donahue to pay fifty percent of his commissions to Bowles–Troy. The court also granted take-nothing summary judgments in favor of Bowles–Troy and the shareholders on Donahue's claims. The trial court awarded Bowles–Troy attorney's fees and expenses.

In ten points of error, Donahue contends that the trial court erred in: (1) declaring that the restrictive covenant is enforceable, (2) granting summary judgment in favor of Bowles–Troy and the shareholders on his claims against them, and (3) awarding attorney's fees and expenses to Bowles–Troy. We reverse the portion of the trial court's judgment declaring that the covenant not to compete is enforceable and ordering Donahue to pay fifty percent of his commissions to Bowles–Troy. We render judgment that the covenant not to compete is unenforceable. We reverse the portion of the trial court's judgment ordering that Donahue take nothing on his causes of action against Bowles–Troy and the shareholders and remand those claims to the trial court for further proceedings. We also reverse the portion of the trial court's judgment awarding attorney's fees and expenses to Bowles–Troy and remand the issue of attorney's fees to the trial court.

### Factual and Procedural Background

On August 15, 1983, James Donahue began selling insurance for the insurance company that is now Bowles–Troy. At that time, Donahue signed an Employment Agreement containing the following covenant not to compete:

> Employee covenants that, for a period of three (3) years after termination of his employment, irrespective of the time, manner or cause of said termination, he will not, directly or indirectly accept or write insurance business or provide administrative services for any of the Company's customers or solicit insurance business from any of the Company's customers.

The Employment Agreement, as amended in 1985, provided that the penalty for violating the covenant not to compete was fifty percent of the commissions and/or fees on the business written in violation of the covenant for a period of three years from the date of the violation.

During his employment, Donahue acquired 22,500 shares of Bowles–Troy stock. On January 1, 1991, all Bowles–Troy shareholders and their wives executed a Buy–And–Sell Agreement, which required that, within ninety days of the termination of a shareholder's employment, that shareholder must sell his stock and Bowles–Troy must buy it. The Buy–And–Sell Agreement required the stock to be purchased "at fair market value as determined by appraisal" and provided the following method for determining the value of the shares:

4. *Valuation of Stock.*

a. Within 60 days of the beginning of each fiscal year of the Corporation, the Board of Directors will hire a reputable, independent appraiser, familiar with the valuation of insurance agencies such as the Corporation, to appraise the value of the Shares as of the last day of the immediately preceding fiscal year of the Corporation.

b. By using the values per share, determined by the above described appraisals, as of the last day of each of the three immediately completed and preceding fiscal years of the Corporation, adding them together and dividing by three, an average valuation price per share over the preceding three years can be obtained. The total value of a party's stock is determined by multiplying this average price per share times the number of shares he holds.

The Buy–And–Sell Agreement further provided that, upon termination of Donahue's employment, to the extent permitted by the Texas Business Corporation Act, Bowles–Troy "shall be obligated to close the purchase of the shares." To the extent Bowles–Troy cannot do so, the other shareholders,

---

**2.** These individual appellees are: Donald E. Bowles, Sr., Wylfa A. Bowles, Donald E. Bowles, Jr., Jane R. Bowles, Edward R. Troy, Sharon Troy, Byron E. Johnson, Roberta M. Johnson, John W. Liske, Denise Liske, John V. Heath, and Carol Heath.

jointly and severally, shall be obligated to close the purchase of the shares.

Donahue voluntarily terminated his employment with Bowles–Troy on March 25, 1994. After Donahue quit, however, he expressed his opinion that the covenant not to compete in the Employment Agreement was unenforceable. Upon learning that Donahue thought the covenant was unenforceable, Hales & Associates, the firm used by Bowles–Troy to conduct appraisals, reevaluated its opinion of the fair market value of Bowles–Troy stock for the 1991 and 1992 fiscal years using the assumption that all restrictive covenants in place with Bowles–Troy employees were unenforceable. Hales & Associates completed the appraisal for fiscal year 1993 about two months after Donahue left Bowles–Troy. That appraisal, dated May 27, 1994, states:

> We would also clearly note that [the fair market value of Bowles–Troy as of December 31, 1993] contemplates that *all* owners and producers will have executed valid and enforceable restrictive covenants. If this is not the case, for whatever reason, adjustments will need to be made to our opinion of the firm's fair market value.

In a separate letter also dated May 27, 1994, Hales & Associates informed Bowles–Troy of its opinion of the fair market values of the stock for 1991, 1992, and 1993 if no enforceable restrictive covenants exist. Using the revised figures, the value of Donahue's 22,500 shares is $438,075. Using the original appraisal values for fiscal years 1991, 1992, and 1993, the value of Donahue's stock is $899,700.07.

On June 22, 1994, Bowles–Troy delivered to Donahue's attorney a note in the amount of $438,075. The next day, Donahue's attorney notified the attorney for Bowles–Troy that the note was ineffective as a tender of performance under the Buy–And–Sell Agreement. Donahue and his wife executed a Stock Assignment, tendering the 22,500 shares of stock to Bowles–Troy and the shareholders for purchase. Counsel for Donahue notified the shareholders individually that Bowles–Troy did not meet its obligation to purchase Donahue's stock and demanded payment from them.

Bowles–Troy sued Donahue for declaratory judgment, asking the court to declare that the covenant not to compete is enforceable. Donahue counterclaimed for breach of the Buy–And–Sell Agreement and recovery of attorney's fees incurred in defending the declaratory judgment. He also filed a third-party action against the shareholders for breach of the Buy–And–Sell Agreement. During the pendency of the suit, Bowles–Troy paid its monthly installments on the note into the registry of the court.

All parties filed motions for summary judgment. Bowles–Troy asked for a summary judgment declaring that the restrictive covenant is enforceable and for attorney's fees. Donahue filed a motion for summary judgment asking for a declaratory judgment in his favor, attorney's fees, and judgment on his breach of contract claim against Bowles–Troy. Donahue, as third-party plaintiff, also filed a motion for summary judgment on his breach of contract claim against the shareholders. The shareholders filed their own motion for summary judgment, asking the court to rule that they had no obligation to purchase Donahue's shares.

On May 18, 1995, the trial court granted Bowles–Troy's motion for summary judgment and denied Donahue's motion for summary judgment against Bowles–Troy. The judge signed an interlocutory summary judgment declaring that the covenant not to compete was enforceable and that Donahue was obligated to pay Bowles–Troy fifty percent of the commissions he received from its clients. On April 23, 1995, Bowles–Troy had delivered to Donahue a note in the amount of $899,700, payable only if Donahue did not appeal the trial court's judgment. Bowles–Troy also paid into the registry of the court additional interest on the higher principal amount.

Bowles-Troy filed a second motion for summary judgment, asserting that it was entitled to summary judgment on Donahue's breach of contract claim. After a hearing on the remaining summary judgment motions, the trial court granted Bowles–Troy's second motion for summary judgment. The court ordered that Donahue take nothing on his counterclaim against Bowles–Troy. Also, the

trial court granted the shareholders' motion for summary judgment, and denied Donahue's motion, on Donahue's breach of contract claim against the shareholders. The court ordered that Donahue take nothing on his claim against the shareholders. The court awarded Bowles–Troy attorney's fees and expenses in the amount of $103,299.81, plus additional fees in the event of an appeal. This appeal followed.

## Standard of Review

The standards for reviewing a summary judgment are well established. The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548 (Tex.1985); *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex. 1972). A plaintiff, as movant, must conclusively prove all essential elements of its claim. *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986). A defendant moving for summary judgment must either (1) disprove at least one element of the plaintiff's theory of recovery, or (2) plead and conclusively establish each essential element of an affirmative defense. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 679 (Tex.1979); *Zep Mfg. Co. v. Harthcock,* 824 S.W.2d 654, 657 (Tex.App.—Dallas 1992, no writ).

When both parties move for summary judgment, we must indulge all reasonable inferences and resolve all doubts in favor of the losing party. *Bossin v. Towber,* 894 S.W.2d 25, 29 (Tex.App.—Houston [14th Dist.] 1994, writ denied). Also, where both parties file motions for summary judgment, and one is granted and one is denied, the denial may be considered by the reviewing court if the appealing party complains of both the granting of the opponent's motion and the denial of its own motion. *Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988). If a movant does not show its entitlement to summary judgment as a matter of law, this Court must remand the case to the trial court. *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 829 (Tex.1970).

## Restrictive Covenant

In points of error one through four, Donahue asserts the trial court erred in declaring that the covenant not to compete is enforceable as a matter of law. The enforceability of a covenant not to compete is a question of law for the court. *Light v. Centel Cellular Co.,* 883 S.W.2d 642, 644 (Tex.1994). Section 15.50 of the business and commerce code provides the following criteria for determining the enforceability of a covenant not to compete:

[A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com.Code Ann. § 15.50 (Vernon Supp.1997). Thus, section 15.50 requires us to make two initial inquiries as to the formation of the covenant not to compete: (1) is there an otherwise enforceable agreement, to which (2) the covenant not to compete is ancillary or a part of at the time the agreement is made. *Light,* 883 S.W.2d at 644. In his first point of error, Donahue contends that, because the evidence conclusively established the covenant not to compete was not ancillary to or part of an otherwise enforceable agreement, the trial court erred in declaring that the covenant is enforceable.

■ In the trial court, there was some dispute between the parties about whether Donahue was an at-will employee of Bowles–Troy. On appeal, however, Bowles–Troy does not dispute Donahue's assertion that he was an employee at-will. By definition, an employee at-will and his employer cannot form an "otherwise enforceable agreement" pertaining to the duration of employment. *Id.* Consideration for a promise, by either the employee or the employer in an at-will situation, cannot be dependent on a period of continued employment. *Id.* Such a promise would be illusory because it fails to bind the promisor who always retains the option of discontinuing employment in lieu of perform-

ing. *Id.* at 645. In other words, otherwise enforceable agreements can emanate from at-will employment so long as the consideration for any promise is not illusory. *Id.*

Bowles-Troy maintains that the Employment Agreement and a Shareholders Agreement were part of a single transaction in 1983 and are inextricably intertwined. According to Bowles–Troy, the two agreements together form one otherwise enforceable agreement to which the covenant not to compete is ancillary or a part of at the time that agreement was made. We disagree.

The record shows that Donahue signed the Employment Agreement on August 15, 1983. Bowles–Troy asserts in its brief that Donahue signed a Shareholders Agreement on September 1, 1983. There is no summary judgment evidence with respect to a September 1, 1983 Shareholders Agreement. The record does contain a Buy–And–Sell Agreement dated January 1, 1991. It could not have been part of a 1983 transaction.

In support of its argument that the Employment Agreement and a September 1, 1983 Shareholders Agreement were part of the same transaction, Bowles–Troy relies on affidavits from Donald Bowles and Edward Troy. In their affidavits, Bowles and Troy each state that the company would not have offered or sold Donahue stock unless he agreed to sign the Employment Agreement and honor its terms.[3] Because the affidavits do not mention a 1983 Shareholders Agreement, it cannot be considered as part of an otherwise enforceable agreement. Thus, we will examine the Employment Agreement to determine if it is an otherwise enforceable agreement to which the covenant not to compete is ancillary or a part of at the time the agreement was made.

■ The Employment Agreement contains the following illusory promises: (1) Bowles–Troy promised to compensate Donahue in exchange for his services; and (2) Donahue promised not to work for anyone else while working for Bowles–Troy. These promises are illusory because they are dependent upon some interval of continued at-will employment. *See id.* at 646 n. 9. They cannot form the basis of an otherwise enforceable agreement.

■ The Employment Agreement does contain the following nonillusory promises: (1) a promise by Donahue to surrender to Bowles–Troy, upon termination of his employment, all lists, books of account, and records relating to the company's business, clients, or prospective clients, and all other company property, *see CRC–Evans Pipeline Int'l, Inc. v. Myers,* 927 S.W.2d 259, 263 (Tex.App.—Houston [1st Dist.] 1996, no writ); and (2) Donahue and Bowles–Troy each agreed to give the other thirty days prior written notice to terminate the Employment Agreement.[4] Thus, an otherwise enforceable agreement existed for Donahue to return Bowles–Troy's property upon termination of his employment and to give thirty days notice in exchange for Bowles–Troy's giving him thirty days notice. *See Light,* 883 S.W.2d at 646.

■ The second inquiry under section 15.50 is whether the covenant not to compete is ancillary to or part of this otherwise enforceable agreement. *Id.* at 646–47. For a covenant not to compete to be ancillary to an otherwise enforceable agreement between employer and employee:

(1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in

---

3. In appellees' response to Donahue's reply brief, Bowles–Troy contends that, in addition to being ancillary to the Employment Agreement and the Shareholders Agreement, the restrictive covenant was ancillary to Bowles–Troy's agreement to issue stock to Donahue. There is no evidence in the record of a specific agreement to issue stock to Donahue. Further, we will not consider this argument because Bowles–Troy did not present it to the trial court in its motions for summary judgment. *See McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 339 (Tex.1993).

4. The Employment Agreement also provided that it could be terminated whenever Donahue and Bowles–Troy mutually agreed in writing. Even if the thirty-day notice provision precludes the employment relationship from being at-will, an issue we need not and do not decide, the covenant at issue would not be ancillary to such an agreement. *See Light,* 883 S.W.2d at 646 n. 10.

restraining the employee from competing; and

(2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement.

*Id.* at 647. For example, if an employer gives an employee confidential and proprietary information or trade secrets in exchange for the employee's promise not to disclose them, and the parties enter into a covenant not to compete, the covenant is ancillary to an otherwise enforceable agreement. *Id.* at 647 n. 14.

■ In this case, the only nonillusory promise made by Bowles–Troy was to give Donahue thirty days notice if it wished to terminate the Employment Agreement. Under the first part of the *Light* test, the consideration given by Bowles–Troy in the otherwise enforceable agreement must give rise to Bowles–Troy's interest in restraining Donahue from competing. According to Bowles–Troy, the restrictive covenant was intended to protect the value of the company's goodwill and customer relationships, which it contends constitute about half of the value of its stock. (The Employment Agreement itself does not reflect this intention.) Bowles–Troy's promise to give thirty days notice does not give rise to its stated interest in restraining Donahue from competing. *See id.* at 646 n. 10. We thus conclude that the covenant not to compete is not ancillary to or a part of the otherwise enforceable agreement contained in the Employment Agreement. We sustain Donahue's first point of error.

In view of our disposition of Donahue's first point of error, we need not consider his second, third, and fourth points of error, in which he raises other complaints about the enforceability of the covenant not to compete. *See* TEX.R.APP. P. 90(a).

## Breach of the 1991 Buy–And–Sell Agreement

In his fifth point of error, Donahue contends that the trial court erred in rendering summary judgment against him on his breach of contract counterclaim because there was evidence that Bowles–Troy breached the Buy–And–Sell Agreement. Donahue contends that, regardless of the enforceability of the restrictive covenant, Bowles–Troy breached the Buy-And-Sell Agreement because it offered him $438,075 for his shares instead of $899,700.07, their value as originally appraised. Donahue asserts that he fulfilled his obligations under the Buy–And–Sell Agreement by unconditionally tendering his stock to the corporation on July 23, 1994 and delivering to Bowles–Troy an assignment of that stock. Donahue maintains that the Buy–And–Sell Agreement is unambiguous regarding the value of the stock because it does not contain a provision permitting Bowles–Troy to obtain a reevaluation of the stock value.

Bowles-Troy also maintains that the Buy–And–Sell Agreement is unambiguous regarding the value of the stock.[5] Bowles–Troy contends that the Buy–And–Sell Agreement provided a specific procedure for determining the price of the stock, using the value as determined by a reputable, independent appraiser. The independent appraiser, Hales & Associates, revalued Bowles–Troy when it learned of the possibility that the covenants not to compete might be unenforceable. According to Bowles–Troy, it did not breach the Buy-And–Sell Agreement because it offered

---

**5.** In its brief, Bowles–Troy also asserts the following defenses to Donahue's breach of contract action: (1) excuse; (2) mutual mistake; and (3) frustration of purpose. Bowles–Troy did not raise these defenses in its motions for summary judgment and therefore cannot rely on them to uphold the trial court's judgment. *See McConnell,* 858 S.W.2d at 339. Bowles–Troy also asserts the defense of estoppel by contract. *See Hawn v. Hawn,* 574 S.W.2d 883, 886 (Tex.Civ. App.—Eastland 1978, writ ref'd n.r.e.) (party to contract is not permitted to take position inconsistent with its provisions, to detriment of another). Bowles–Troy contends that Donahue cannot repudiate the restrictive covenant and then claim that Bowles–Troy breached the Buy–And–Sell Agreement. We note that the covenant not to compete was not part of the contract for the sale of stock. Nevertheless, because we have determined that the covenant not to compete is unenforceable, Bowles–Troy's estoppel argument lacks merit. *See Echols v. Bloom,* 485 S.W.2d 798, 801 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.) (unless contract has been fully executed, estoppel by contract cannot be predicated on an invalid contract).

Donahue $438,075, the value of his shares as determined by an independent appraiser.

■■■ If a written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). A contract, however, is ambiguous when its meaning is uncertain or doubtful or it is reasonably susceptible to more than one meaning. *Id.* Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Id.* at 394. When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue. *Id.; Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex.1980). A court may conclude that a contract is ambiguous even in the absence of such a pleading by either party. *Sage St. Assocs. v. Northdale Constr. Co.,* 863 S.W.2d 438, 445 (Tex.1993); *see Coker,* 650 S.W.2d at 392–94 (although both parties asserted property settlement agreement was unambiguous and moved for summary judgment, supreme court concluded ambiguity existed).

■■■ An ambiguity in a contract may be either patent or latent. *Sidelnik v. American States Ins. Co.,* 914 S.W.2d 689, 691 (Tex.App.—Austin 1996, writ denied). A patent ambiguity is evident on the face of the contract. *Id.* A latent ambiguity exists when a contract is unambiguous on its face, but fails by reason of some collateral matter when it is applied to the subject with which it deals. *Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 282–83 (Tex.1996) (per curiam). The ambiguity must become apparent when the contract is read in the context of surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity. *National Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 521 (Tex. 1995). For example, if a contract called for goods to be delivered to "the green house on Pecan Street," and there were two green houses on the street, the contract would contain a latent ambiguity. *Friendswood,* 926 S.W.2d at 283.

The section of the Buy–And–Sell Agreement at issue here, the provision describing the method for valuation of the shares, is not ambiguous on its face. But, in the context of the surrounding circumstances, there is a latent ambiguity. The Buy–And–Sell Agreement provides that, within sixty days of the beginning of each fiscal year, Bowles–Troy will hire a reputable, independent appraiser to appraise the value of the shares as of the last day of the immediately preceding fiscal year. The total value of a shareholder's stock is determined by multiplying the average of the appraised values per share for the three immediately completed and preceding fiscal years times the number of shares he holds.

■■■ Hales & Associates prepared two appraisals for the Bowles–Troy stock at issue. The Buy–And–Sell Agreement did not provide any time frame within which an appraisal had to be completed. Moreover, the contract says nothing one way or the other about a right to reappraise the shares in light of new information. From the terms of the Buy–And–Sell Agreement, it is impossible to determine which of the two appraisals should be used to determine the value of Donahue's shares. *See id.* There is a latent ambiguity which must be determined by the trier of fact. *See Franklin v. Jackson,* 847 S.W.2d 306, 310–11 (Tex.App.—El Paso 1992, writ denied) (because agreement for lease of peanut allotment was silent with respect to disposition of increase in allotment, increase in allotment created latent ambiguity). Summary judgment was inappropriate because a fact issue exists about the parties' intent regarding a right to revalue the stock based on new information. We sustain Donahue's fifth point of error. Because we have concluded that there is a fact issue, we overrule Donahue's sixth point of error in which he contends the evidence conclusively established that Bowles–Troy breached the Buy–And–Sell Agreement.

In his seventh point of error, Donahue contends the trial court erred in granting summary judgment in favor of the shareholders on his third-party breach of contract

claim against them because there was evidence that the shareholders had breached the Buy–And–Sell Agreement. The Buy–And–Sell Agreement provided that, to the extent Bowles–Troy cannot close the purchase of Donahue's stock, the other shareholders, jointly and severally, shall be obligated to do so. When Bowles–Troy failed to pay him $899,700.07 for his stock, Donahue sued the other shareholders. According to Donahue, the shareholders were required to purchase his stock because Bowles–Troy's failure to pay $899,700.07 was evidence that it could not do so. The parties disagree about when the terms of the Buy–And–Sell Agreement require the shareholders to purchase the stock.

Under the Buy–And–Sell Agreement, the shareholders' obligation to purchase Donahue's shares is contingent upon Bowles–Troy being unable to do so. As of the date of oral argument, Bowles–Troy still owed Donahue for his stock. We have remanded Donahue's breach of contract action against Bowles–Troy to the trial court because the amount Bowles–Troy owes Donahue is uncertain. It would be premature to conclude that, because they have no obligation to purchase the shares, the shareholders did not breach the Buy–And–Sell Agreement. We sustain Donahue's seventh point of error. We overrule Donahue's eighth point of error in which he contends the evidence conclusively established the shareholders' liability to purchase his stock under the Buy–And–Sell Agreement.

## Attorney's Fees

In his ninth and tenth points of error, Donahue complains of the trial court's award of attorney's fees and expenses to Bowles–Troy. The trial court awarded Bowles–Troy attorney's fees and expenses totalling $103,299.81. In the event of an appeal in which Bowles–Troy is successful, the court awarded it $7,500 at the court of appeals level, $5,000 if a writ of error to the supreme court is filed, and $7,500 if the supreme court grants a writ of error. The trial court's judgment does not specify on what basis it made its award of attorney's fees. Donahue contends that: (1) if the judgment is reversed on the

merits, the fee award should not stand; (2) Bowles–Troy failed to segregate the fees; and (3) the award contains amounts that are improper as a matter of law.

The grant or denial of attorney's fees in a declaratory judgment action lies within the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing that it abused that discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985); *Hasty Inc. v. Inwood Buckhorn Joint Venture*, 908 S.W.2d 494, 502 (Tex.App.—Dallas 1995, writ denied). In any declaratory judgment proceeding, a court may award "reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (Vernon 1986). Because we have determined that the covenant not to compete is unenforceable, the trial court's award of attorney's fees to Bowles–Troy is not equitable and just. *See Treetop Apartments Gen. Partnership v. Oyster*, 800 S.W.2d 628, 630 (Tex.App.—Austin 1990, no writ).

Bowles-Troy contends that the trial court's take-nothing judgments on Donahue's breach of contract claims against Bowles–Troy and the shareholders also support the award of attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 1986). Because we have determined that the trial court erred in granting summary judgment in favor of appellees on Donahue's breach of contract claims, however, any fee award based on section 38.001 must fail. *See Farmers Tex. County Mut. Ins. Co. v. Griffin*, 868 S.W.2d 861, 870 (Tex.App.—Dallas 1993, writ denied) (party seeking attorney's fees must present valid claim). We therefore sustain Donahue's ninth point of error. We reverse that portion of the trial court's judgment awarding attorney's fees and expenses to Bowles–Troy and remand the issue of attorney's fees to the trial court. We need not consider Donahue's tenth point of error. *See* Tex. R.App. P. 90(a).

In sum, we reverse that portion of the trial court's judgment declaring the restrictive covenant to be enforceable and ordering Donahue to pay Bowles–Troy fifty percent of the commissions he received from its clients. We render judgment that the covenant not to

compete is unenforceable. We reverse that portion of the trial court's judgment ordering that Donahue take nothing on his claims against Bowles–Troy and the shareholders. We remand those causes of action to the trial court for further proceedings. We also reverse that portion of the trial court's judgment awarding attorney's fees and expenses to Bowles–Troy and remand the issue of attorney's fees to the trial court.

MOSELEY, J., concurs.

MOSELEY, Justice, concurring.

The majority holds that the covenant not to compete before us is unenforceable under Texas law,[1] as analyzed by the Texas Supreme Court in *Light v. Centel Cellular Co.*[2] As I can find no way to distinguish *Light* from this case, I concur with the majority. However, I write separately because *Light* effectively nullifies a portion of the statutory language governing noncompete agreements. Under a proper reading of that statute, I would decide this case differently.

### Background

Prior to 1989, covenants not to compete were governed solely by common law. In response to decisions issued by the Texas Supreme Court, in 1989, the Texas legislature passed the original Covenants Not To Compete Act ("the Act").[3] The Act added section 15.50 to the business and commerce code, which provided:

Notwithstanding Section 15.05 of this code, a covenant not to compete is enforceable to the extent that it:

(1) is *ancillary to* an otherwise enforceable agreement but, if the covenant not to compete is executed on a date other than the date on which the underlying agreement is executed, such covenant must be supported by independent valuable consideration; and

(2) contains reasonable limitations as to time, geographical area, and scope of activity to be restrained that do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.[4]

Subsequent supreme court cases minimized the effects of the Act. For instance, without deciding whether the Act applied retroactively to covenants entered into before its effective date, in *DeSantis v. Wackenhut Corp.*[5] and *Martin v. Credit Protection Ass'n,*[6] the court concluded in each case that the covenant in question was invalid under common law and stated that application of the Act would not change the outcome of the case.[7] Additionally, the court's later opinion in *Travel Masters, Inc. v. Star Tours, Inc.* was decided solely on the basis of *DeSantis* and *Martin,* without reference to the Act.[8]

Furthermore, these cases determined whether noncompete agreements were enforceable using criteria that differed from the Act. In *DeSantis,* for example, the court employed the following three-part test to determine the reasonableness of a covenant not to compete:

1. The agreement not to compete must be ancillary to an otherwise *valid transaction or relationship.*

2. The restraint created by the agreement not to compete must not be greater than necessary to protect the promisee's *legitimate* interest.

3. *The promisee's need for the protection afforded by the agreement not to compete must not be outweighed by either*

---

**1.** *See* Tex. Bus. & Com.Code Ann. § 15.50 (Vernon Supp.1997).

**2.** 883 S.W.2d 642 (Tex.1994).

**3.** *See id.* at 643 n. 2; Richard L. Armstrong, *The Changing Face of Noncompetition and Nondisclosure Covenants,* 57 Tex. B.J. 962, 964 (1994).

**4.** Act of May 23, 1989, 71st Leg., R.S., ch. 1193, § 1, 1989 Tex. Gen. Laws 4852, 4852, *amended by* Act of May 29, 1993, 73d Leg., R.S., ch. 965,

§ 2, 1993 Tex. Gen. Laws 4201, 4201 (current version at Tex. Bus. & Com.Code Ann. § 15.05 (Vernon 1987 & Supp.1997)) (emphasis added).

**5.** 793 S.W.2d 670, 681–84 (Tex.1990).

**6.** 793 S.W.2d 667, 669 (Tex.1990).

**7.** *DeSantis,* 793 S.W.2d at 684–85; *Martin,* 793 S.W.2d at 669 n. 1.

**8.** 827 S.W.2d 830, 832–33 (Tex.1991).

*the hardship to the promisor or any injury to the public.*[9]

In *Martin*, the court stated that "[a]n enforceable covenant not to compete must be ancillary to an otherwise valid contract *whose primary purpose is unrelated to the suppression of competition between the parties.*"[10]

In 1993, after the Texas Supreme Court decided *DeSantis, Martin,* and *Travel Masters,* the legislature again amended the business and commerce code.[11] The legislature expressly stated that section 15.50 preempts common law and contains the exclusive criteria for determining the enforceability of a covenant not to compete.[12] The legislature also revised section 15.50 of the Texas Business and Commerce Code to state that

> a covenant not to compete is enforceable if it is *ancillary to or part of* an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.[13]

### Light v. Centel Cellular Co.

*Light* was the first case involving the interpretation of the 1993 amendments to come before the Texas Supreme Court following their passage. *Light* acknowledged the legislature's intent to preempt common law concerning covenants not to compete.[14] However, the court stated that the legislature did not provide any standards for assessing whether or not such a covenant is *ancillary to or part of* an otherwise enforceable agreement.[15] To fashion such a standard, *Light* looked to Justice Stevens's dissent in *Business Electronics v. Sharp Electronics,* which argued that a restraint is not *ancillary to* a contract unless it is designed to enforce a contractual obligation of the parties.[16] *Light* determined that this "designed-to-enforce-a-contractual-obligation standard for assessing whether a covenant is ancillary to an otherwise enforceable agreement" was consistent with the Texas Supreme Court's pre-amendment (*e.g.,* common law) holdings regarding the permissible scope of a valid restraint of trade, citing *DeSantis.*[17]

Therefore, *Light* fashioned a new test based on the dissent in *Business Electronics,* which echoed the "interest worthy of protection" standard from *DeSantis*[18]:

> [I]n order for a covenant not to compete to be *ancillary to* an otherwise enforceable agreement between employer and employee:
>
> (1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and
>
> (2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement.[19]

Note, this test only addresses whether a covenant not to compete is *ancillary to* an otherwise enforceable agreement-not whether a covenant is *part of* an otherwise enforceable agreement. Nevertheless, immediately after setting forth this test, *Light* stated: "Unless both elements of the test are satisfied, the covenant cannot be *ancillary to or part of* an otherwise enforceable agreement."[20] *Light* thus lumped together the two alternative elements found in section

---

9. *DeSantis,* 793 S.W.2d at 681–82.

10. *Martin,* 793 S.W.2d at 669 (emphasis added).

11. *See* Tex. Bus & Com Code Ann. §§ 15.50–.52 (Vernon Supp.1997).

12. *Id.* § 15.52.

13. *Id.* § 15.50 (emphasis added).

14. *Light,* 883 S.W.2d at 647.

15. *Id.*

16. 485 U.S. 717, 739–41, 744–46, 108 S.Ct. 1515, 1527–28, 1530–31, 99 L.Ed.2d 808 (1988) (Stevens, J., dissenting).

17. *Light,* 883 S.W.2d at 647.

18. *DeSantis,* 793 S.W.2d at 682.

19. *Light,* 883 S.W.2d at 647 (emphasis added).

20. *Id.*

15.50 of the business and commerce code, effectively rendering the "or part of" phrase in the 1993 amendments a nullity.

### Analysis

We presume that every word in the statute possesses a significant purpose and meaning.[21] In other words, the legislature presumptively had a purpose when it included both the phrases "ancillary to" and "or part of" in the statute. Because the legislature did not define these phrases, we consider their ordinary meaning.[22] "Ancillary to" and "part of" do not have the same ordinary meaning. "Ancillary" means "subordinate or auxiliary to a primary or principal legal document."[23] A "part" is "an essential portion or integral element of something."[24] Even *Light* recognized that the term "part" in the statute literally means "in the same instrument."[25] Utilizing these meanings, the first requirement for an enforceable covenant not to compete under section 15.50 is that the covenant must be either (a) *subordinate or auxiliary to* an otherwise enforceable agreement at the time the agreement was made, or (b) *in the same instrument as* an otherwise enforceable agreement at the time the agreement was made.

*Light* stated that it "interpret[s] the phrase 'or part of' to mean more than merely in the same instrument because such a literal reading renders the phrase 'at the time the agreement is made' redundant."[26] As noted above, I agree with *Light* that the literal meaning of the phrase "or part of" means "in the same instrument." I disagree, however, that using such a literal reading creates a redundancy. By requiring a noncompete agreement to be ancillary to or part of an otherwise enforceable agreement "at the time the agreement is made," the legislature merely recognized that agreements are often amended or supplemented, and expressed a legislative intent that such amendments or supplements cannot "tack on" a noncompete provision to a previously existing, enforceable agreement. Such an intent is also consistent with the intent of the 1989 Act, which required separate consideration to support a noncompete agreement if it was executed on a day other than the date of the underlying agreement.[27] Considering the 1993 amendments in this light, neither the phrase "or part of" nor the phrase "at the time the agreement is made" is redundant. Consequently, there is no need to interpret the phrase "or part of" to mean something different than its literal meaning-"in the same instrument."

I believe a proper application of the "or part of" language from section 15.50, as outlined above, would change the outcome of this case. Here, the covenant not to compete was in the employment agreement that Donahue signed. It was not added later by amendment or supplement. Second, the employment agreement contains other enforceable provisions. Because appellants have not challenged the reasonableness of the covenant's restrictions as to time, geographical area, and scope, that issue is not preserved for our review. Therefore, I would hold that the covenant not to compete is enforceable under section 15.50 of the business and commerce code.

However, I can see no principled way to distinguish this case from *Light*. Until the supreme court again addresses the statutory

---

**21.** *State v. Flag-Redfern Oil Co.*, 852 S.W.2d 480, 487 (Tex.1993) (Gonzalez, J., concurring); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.1981); *see* Tex. Gov't Code Ann. § 311.021(2) (Vernon 1988).

**22.** *Hopkins v. Spring Ind. Sch. Dist.*, 736 S.W.2d 617, 619 (Tex.1987); *see* Tex. Gov't Code Ann. § 311.011(a) (Vernon 1988).

**23.** Webster's Third New International Dictionary 80 (3d ed.1981); *see* Black's Law Dictionary 85 (6th ed.1990) ("auxiliary or subordinate").

**24.** Webster's Third New International Dictionary 1645 (3d ed.1981); *see* Black's Law Dictionary 1117 (6th ed. 1990) ("An integral portion, something belonging to a larger whole; that which together with another or others makes up a whole.").

**25.** *Light*, 883 S.W.2d at 647 n. 12.

**26.** *Id.*

**27.** *See* Act of May 23, 1989, 71st Leg., R.S., ch. 1193, § 1, 1989 Tex. Gen. Laws 4852, 4852 (amended 1993).

language, I believe we are bound by *Light;* I therefore concur with the majority.